UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| HAROLD D. HANSBRO | CIVIL ACTION NO. 04-2284-P |
| versus | JUDGE STAGG |
| BURL CAIN, WARDEN, ET AL. | MAGISTRATE JUDGE HORNSBY |

**REPORT AND RECOMMENDATION**

**Introduction**

A Caddo Parish jury convicted Harold Hansbro ("Petitioner") of the second degree murder of Donald Smith. Petitioner pursued a direct appeal. State v. Hansbro, 796 So.2d 185 (La. App. 2nd Cir. 2001), writ denied, 827 So.2d 1177 (La. 2002). He also filed a post-conviction application in state court before presenting this federal petition for habeas corpus relief.

The court reviewed Petitioner's petition and noted that some of his claims had not been properly exhausted in the state courts. Petitioner was advised of his alternatives and the procedural risks associated with each of them. Doc. 4. Plaintiff responded that he wished to dismiss the unexhausted claims (Nos. two, three, five and six) and proceed toward a resolution of the merits of the other claims. Doc. 5. Accordingly, the claims presented to this court are (a) insufficiency of the evidence, (b) unlawful search incident to arrest, (c) ineffective assistance of counsel and (d) denial of post-conviction DNA testing. It is recommended, for the reasons that follow, that judgment be entered dismissing those claims

with prejudice and dismissing without prejudice the unexhausted claims listed in the petition as issues two, three, five and six.

**Sufficiency of the Evidence**

The state appellate court set forth the relevant facts in great detail. Petitioner does not, with one exception noted below, significantly contest the appellate court's description of the evidence. Rather, he faults the appellate court's conclusion that the evidence described is sufficient to prove beyond a reasonable doubt that he committed second degree murder, which La.R.S. 14:30.1 defines, in relevant part, as the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm.

Petitioner, who is from Arkansas, was hitchhiking to Mississippi to find work when he met Donnie Shaw in a shelter in Texarkana. The two men made their way to Shreveport and were walking along railroad tracks when they came upon two men, Donald Smith and Robert Johnson, who made their home behind an abandoned ice house. Smith and Johnson invited the travelers to join them, and the men spent the morning visiting and drinking.

Petitioner and Shaw asked for directions to get to I-49. Johnson took the men as far as a bus stop, where Johnson caught a bus to pick up a check. Smith stayed behind at the ice house. Petitioner, though he disputes it, then decided to return and rob Smith. Both Petitioner and Shaw testified at trial, and each said it was the other's idea to rob Smith, but both admitted that they did go back to the abandoned ice house, where they found Donald Smith sitting on an old car seat.

Petitioner testified that Shaw began to beat and rob Smith and that, as Shaw began stomping Smith, Petitioner walked away. Shaw testified that the roles were reversed and that Petitioner began to beat and rob Smith, and that it was Shaw who walked away when Petitioner began stomping Smith.

Robert Johnson and a curious police officer found Smith at about the same time later that day. He was dead. A deputy coroner testified that Smith died from multiple blunt trauma injuries to his head that fractured his skull and caused his brain to swell and hemorrhage. Smith also had fractures of all of his ribs.

Robert Johnson gave a detailed description of the men and said that one was a veteran. At 3:30 a.m. the next morning, a Shreveport police officer spotted Petitioner in the parking lot of the "171 Club" that had closed an hour earlier. The officer observed that Petitioner was intoxicated and matched the description of one of the suspects. Petitioner also had a VA card. Petitioner was arrested for public intoxication and placed in a holding cell in his street clothes.

A detective showed a six-person photographic lineup to Robert Johnson, and Johnson identified Petitioner as one of the two suspects. At 10:00 a.m. Petitioner was read his Miranda rights and interviewed about the homicide for the first time. He first denied knowing anything about the crime, but when a detective told Petitioner that an eyewitness placed him at the scene of the crime and that police had recovered some evidence from the area, Petitioner told the detectives that Donnie Shaw had left the bus station alone and

returned to rob the victim. Petitioner said that Shaw returned to the bus stop with blood all over his shirt and admitted that he had robbed the victim. Petitioner was then arrested for the homicide. Police took his street clothes and issued him jail coveralls.

Meanwhile, police received a telephone call from Eric Peck, who said he had been at the 171 Club and talked to a man named "Harold" who said he had gotten into a fight and may have killed a man that day. Peck decided to call police after he heard news reports that a man had been beaten to death in the area. Peck's description of "Harold" matched the description of Petitioner. Peck also identified Petitioner from a six-person lineup as the person he talked to at the club.

The autopsy showed bruise imprints on the face and neck of the victim that appeared to have been made by the sole of a shoe. Detectives recovered Petitioner's shoes from the jail and had the forensics department compare them to the bruising imprints. There was a match, although there was no blood found on the shoes. Detectives again interviewed Petitioner and confronted him with this evidence. According to Detective Andrews, Petitioner reacted as follows:

> At that point he said, you sure my shoes (sic), I said yes. He stated to me, he said that I need a lawyer, you've got me, I need an attorney, and the interview was concluded at that time.

Tr. 737. The interview was not recorded, so we do not have Petitioner's precise words. Tr. 743.

Michelle Gaines from the North Louisiana Criminalistics Lab testified that she tested the jeans Petitioner was wearing at the time of his arrest. She found and tested five blood stains, all of which were determined to be transfer stains, meaning they got on the jeans by contact with something else that had the blood on it. Tr. 868. Stain 1 was consistent with the DNA reference sample taken from Petitioner. Stains 2 and 3 were consistent with reference samples taken from the victim. Stains 4 and 5 were consistent with being mixtures of both reference samples. Ms. Gaines was asked what could have caused the mixture of DNA. She responded that anything that would put the DNA on the jeans at the same time could have caused the mixture. For example, Mr. Hansbro's skin cells may have been shed on his jeans to explain the presence of his DNA. Ms. Gaines was asked if there was any reason to believe that any other person's DNA was present, and she answered that there was no indication of the presence of DNA from any person other than Petitioner and the victim. Tr. 871.

Petitioner called character witnesses in defense, and he took the stand and testified about growing up as the son of a pastor. Petitioner admitted that he lied to police when he gave his initial statement that he was not at the scene at the time of the murder. He said he did so because he did not want anything to do with the matter. Petitioner testified that what actually happened was he and Donnie Shaw were waiting on a bus when Shaw said he was going to "go up here and check out this old man." Petitioner asked what he was talking about, and Shaw said, "I'm going to go over and rob this old man." Petitioner thought Shaw

was kidding because he had not acted like "that type person" in the time they had known each other. Petitioner said Shaw first walked across the street to a store, probably to try to get another beer, but came out and said he did not have any money to buy beer so was going "to go take care of my business." Shaw then headed toward the ice house. Petitioner said that he waited five to seven minutes and then followed to see what was going on. Petitioner said that when he walked up on the scene, Shaw had hit the victim over the head with a beer bottle that broke. Shaw then allegedly hit the victim over the head with another bottle and started to beat him. Petitioner testified that he said, "man you need to quit that" and was "terrorized" by the events. Petitioner said he even got between the men and tried to get Shaw to stop but "might as well have been talking to the wall." Petitioner said he decided to extract himself from the situation, so he walked back to the bus stop. Tr. 929-42.

Defense counsel asked Petitioner if he could explain the waffle type pattern found on the victim that was consistent with Petitioner's shoe pattern. Petitioner responded: "I have no earthly idea. I do not know." He also claimed that he did not have a need for money and could have obtained money that day if he needed it. Tr. 942. Petitioner claimed that Mr. Peck, from the 171 Club, was lying about the inculpatory statements Petitioner made to him. Tr. 943-44.

The state appellate court set forth the facts in great detail and summarized the evidence that, when viewed in the light most favorable to the state, supported the conviction. That evidence included eyewitness testimony from Donnie Shaw, the victim's blood on

Petitioner's pants, the imprint of Petitioner's shoe on the victim's neck and face, Mr. Peck's testimony, Petitioner's three different versions of the events, and Petitioner's statement to detectives "you've got me" when confronted with the shoe imprint evidence. The appellate court noted Petitioner's attacks on and attempted explanations for the various items of evidence, but it properly deferred to the jury that assessed those arguments, judged the credibility of the witnesses and found evidence to support a conviction. Hansbro, 796 So.2d at 194-95.

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The trier of fact has broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id.

The Louisiana appellate court recited and applied the Jackson standard on Petitioner's direct appeal. Thus, its decision was not "contrary to clearly established Federal law," so Petitioner can obtain habeas relief only if the state court's decision was an "unreasonable application" thereof. 28 U.S.C. § 2254(d); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). Under the unreasonable application clause, a federal court is permitted to grant the writ if the state court has identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the prisoner's case. Williams, 120 S.Ct. at 1523. Even if the federal court, in its independent judgment, has a firm

conviction that the state court was incorrect in its application of a federal constitutional principle, that alone does not permit the federal court to grant habeas relief. Relief is not permitted unless the State court decision was so wrong as to be objectively unreasonable. Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003). And it is only the State court's ultimate decision, not the quality of its analysis or opinion, that is at issue. Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002)(en banc).

Petitioner raises with this court essentially the same arguments presented to the appellate court. For example, Petitioner points out that no blood was found on his shoe. The deputy coroner testified, however, that it would be quite possible for an object to be used to smash the skull of a victim without getting blood on the object. He explained at length how it was possible to inflict severe skull injuries without any blood being immediately produced if the skin was not also torn. Tr. 843-45. Petitioner next argues that Donnie Shaw was a convicted felon who was on parole and "had every bit as much to gain from lying as did [Petitioner]." Doc. 1, p. 10. The jury heard both men testify and made a credibility assessment that is generally beyond the scope of Jackson review and is extraordinarily difficult to overcome on federal habeas review. Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005). Petitioner also faults the appellate court for writing that Ms. Gaines said the victim's blood was mixed with Petitioner's *blood*; Petitioner says that it was merely *DNA* that was mixed and that his DNA could have simply resulted from his saliva or skin cells being on his jeans. Ms. Gaines noted that possibility for the jury, but the fact remains that the victim's blood was found in multiple places on Petitioner's jeans. The appellate court

conceded that the blood could have gotten on the pants during the rescue attempt suggested by Petitioner, but it was well within the province of the jury to sort out such possibilities. In the end, there was more than sufficient evidence to support the conviction under the Jackson standard, and there is absolutely no basis for federal habeas relief under the standards of Section 2254(d).

**Search Incident to Arrest**

Petitioner argued in claim three (dismissed as unexhausted) that there was not probable cause to arrest him for first degree murder. He makes a related argument in claim four that the search incident to that arrest, which resulted in the seizure of his clothing and shoes, was also unlawful. That issue is before the court.

A motion to suppress was filed in the trial court, which held a hearing and determined that the arrest and search incident thereto were lawful. The state appellate court reviewed the issues on direct appeal and affirmed that decision. Hansbro, 796 So.2d at 195-96.

A federal habeas court is generally barred from reviewing Fourth Amendment claims. Stone v. Powell, 96 S.Ct. 3037 (1976). In Stone, the Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 96 S.Ct. at 3037. To satisfy the "opportunity for full and fair litigation" requirement, the state need only provide the processes whereby a defendant can obtain full and fair litigation of a Fourth Amendment claim. Stone bars federal habeas consideration of that claim whether or not the

defendant employs those available processes.  Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir. 2002).  Petitioner had both an opportunity under Louisiana law and a full exercise of that opportunity in the trial and appellate courts.  This claim is barred by Stone.

**Ineffective Assistance of Counsel**

Petitioner argues that his court appointed counsel was ineffective because he did not seek independent DNA testing of the blood stains.  Petitioner first raised this issue in a post-conviction application.  He argued that independent testing was needed because the chain of custody of the pants was flawed, the only eyewitness testimony came from the disreputable Donnie Shaw, that Petitioner had no visible injuries to account for the presence of his own blood, and it was possible that the victim's DNA was actually not on the pants. Tr. 1524-25.  The trial judge rejected the claim, ruling:

> "Petitioner has presented nothing to indicate that the DNA testing that was performed was procedurally deficient or flawed, or that the outcome of that testing was in any way unreliable.  There is no indication of a reasonable probability, that absent trial counsel's allegedly deficient conduct, the outcome of the trial would have been different."

Tr. 1543-44.  The appellate court agreed, writing: "The trial court correctly concluded that there is no showing that an independent DNA examination of the clothing would have had any effect on the trial or produced a different outcome."  Tr. 1655.  The Supreme Court of Louisiana denied writs without comment.  Tr. 1824.  Petitioner presents to this court the precise arguments included in his post-conviction application.

If counsel had requested appointment of an expert at the expense of the state, state law would have required that he establish a reasonable probability that an expert would be of

assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet that standard, a defendant must establish with a reasonable degree of specificity that the expert assistance is required to answer a substantial issue or question that is raised by the prosecution's case or to support a critical element of the defense. State v. Lee, 879 So.2d 173, 176-77 (La. App. 1st Cir. 2004), citing State v. Touchet, 642 So.2d 1213 (La. 1994).

Petitioner's arguments are largely directed at the credibility of witnesses, the conclusions that should be drawn from circumstantial evidence, and an attack on the chain of custody. Nothing in those arguments suggests a reasonable probability that a second DNA expert would have been of assistance or that the absence of a second expert resulted in a fundamentally unfair trial. Petitioner also suggests that testing by a second expert "may have shown" that the DNA of Petitioner or the victim was not on the pants, but such pure speculation is a far cry from the reasonable degree of specificity that must be shown to be entitled to an appointed expert. Petitioner has yet to articulate a basis for the appointment of an expert, so counsel was not ineffective for failing to make such a request, and the state courts did not make an objectively unreasonable application of Strickland when they denied this claim. See Guidry v. Cain, 2005 WL 1330133 (W. D. La. 2005) (Hill, M.J.) (rejecting Strickland claim based on lack of request for pathology expert because petitioner failed to identify an expert witness who would have delivered testimony favorable to the defense).

**Post-Conviction DNA testing**

Petitioner's post-conviction application requested DNA testing pursuant to La. C. Cr. P. art. 926.1. That article provides that, prior to August 31, 2007, a person convicted of a felony may file an application under the article for post-conviction relief requesting DNA testing of an unknown sample secured in relation to the offense for which he was convicted. After that date, a post-conviction request for testing is subject to the rules governing repetitive and untimely applications.

An application under Article 926.1 must include an explanation of why there is articulable doubt based on competent evidence as to the guilt of the petitioner and that DNA testing will resolve that doubt and establish the petitioner's innocence. Petitioner did not identify in his application any "unknown sample" for testing. Rather, he merely questioned the reliability of the evidence against him, noted that the DNA evidence was of significant importance to establish that Petitioner rather than Donnie Shaw was the killer, and requested that the stains on the blue jeans be tested again. Tr. 1526-27. The trial judge characterized the argument as another "sufficiency of the evidence" argument that did not set forth an articulable doubt as to guilt and did not make any showing that the original testing was in any way flawed or unreliable. The application was denied. Tr. 1545-46.

The application filed in the trial court relied solely upon state law. Petitioner's application to the appellate court included the same arguments but added that failure to retest the evidence would be a denial of due process under the "United States Constitution." Tr. 1564-65. The appellate court held, "The trial court properly denied the claim for DNA

testing, because there is no articulable doubt as to the innocence of the petitioner." The court added: "The evidence shows that the applicant here was either a murderer, or a principal to murder, without any resort to the DNA evidence." Tr. 1676.

This court is not concerned with whether the state courts properly applied Article 926.1 because federal habeas relief does not lie for errors of state law. Collier v. Cockrell, 300 F.3d 577, n. 5 (5th Cir. 2002). The state court's action must violate a federal constitutional right to merit habeas relief, and Petitioner has made only a conclusory assertion of a due process violation. The state court's resolution of the request for post-conviction testing was based on a reasonable assessment of the record and did not violate principles of fundamental fairness or other due process concerns.

Accordingly;

**IT IS RECOMMENDED** that the unexhausted claims listed in the petition as issues two, three, five and six be dismissed **without prejudice** and that all other claims in the petition be rejected on the merits and **dismissed with prejudice**.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are

directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this the 20th day of October, 2006.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE